And we'll hear first from Ms. Bolt. You may proceed. Good morning, Your Honors, and may it please the Court, Brenda Bolt on behalf of Petitioner Jose Garcia Aguilar. I'd like to discuss with you today Jose's applications for relief under the Convention Against Torture, and my colleague, Alvaro Huerta, will be discussing the agency's particularly serious crime determination. I aim to reserve four minutes of my time for rebuttal. You get closer to the better? Yes. Thank you, Your Honor. Jose is a Mexican national with two young U.S. citizen sons who fears torture by police and in mental health institutions. I'd like to discuss first Jose's risk of torture in mental health institutions alone. The agency made positive findings on every element of Jose's claim except for likelihood, which it rejected without grappling with Jose's documentary and testimonial evidence that in 2018 he was arrested as a result of his mental health symptoms and his experts' opinions that the same thing will happen in Mexico but end in his torture. This court in Castillo v. Barr held that the agency may not silently disregard or reject expert testimony without stating the record why that testimony was insufficient to establish the probability of torture. Here, Ms. Rodriguez was qualified as a country conditions expert and opined at AR 640 that Jose would be unable to obtain his The board conceded that the immigration judge never discussed Ms. Rodriguez's testimony in her analysis. Did Ms. Rodriguez provide testimony as to the availability and cost of the specific medication that your client needs? No, Your Honor. She provided testimony as to the barriers that Jose would face in obtaining medication, including the fact that clinics were few and far between. He would have to be accompanied by a family member and the medication is often not available at these clinics. Did she provide any testimony about the specific outpatient mental health facilities available in Michoacán? No, Your Honor. She stated on the record that she wasn't able to travel to Michoacán because of safety concerns. I suppose my question then is how can her testimony have been either highly probative or dispositive of the issues in this case when when her testimony wasn't very specific about the issues in this case? Your Honor, Ms. Rodriguez was qualified as a country conditions expert and the fact that she wasn't able to travel to Michoacán because of safety concerns hardly disqualifies her testimony as...doesn't contradict...I'm not saying that it would disqualify her testimony, but how is her testimony really probative on the issue of whether he'll be able to obtain medication or treatment? This court in Aguilar-Ramos held that the expert does not need to have personal experience to make her opinions and may rely on hearsay. So Ms. Rodriguez's opinions could have been based on what she has heard about clinics in Michoacán. Why then isn't the immigration judge entitled to make a choice and credit the other evidence about the new medical program coming online, the specific availability of Abilify? It's, again, it's not that the judge ignored the expert. Why can the judge not credit that other evidence instead? She is, Your Honor, but then in the record she needed to explain those reasons. Here the only country conditions evidence she cites, the article, does not directly refute Ms. Rodriguez's testimony and without providing her reasons for rejecting Ms. Rodriguez's testimony, this court has no way to evaluate whether those reasons fall in line with its precedent. We also have a lot of case law that says that the IJ doesn't need to tick through every item of evidence that's relevant to the point. The IJ was certainly aware of her testimony because the IJ put a lot of weight on the testimony for other aspects of the standard, but on this specific issue of whether he would, as a practical matter, have access to this specific medication, it's not mentioned, but isn't it more reasonable to say it wasn't mentioned because it wasn't particularly probative or helpful? And why does there have to be, consistent with our rule, you don't have to mention every item. Why is it your view it had to be mentioned? Your Honor, that's because Ms. Rodriguez's opinion was specific to Jose. She knew about his family situation and she opined directly on his likelihood of obtaining his medication. And there is an exception in the case law when an expert opines specifically to an applicant. If your Honors have no more questions on that point, I'd like to turn quickly to the agency's second finding, which fails to grapple with highly probative, potentially dispositive evidence, documentary and testimonial evidence. The agency misstated the record when it found that Jose did not allege that his prior symptoms had resulted in issues with authorities. This misstatement is an indication that the agency ignored Carolina and Jose's credible testimony, that the entire reason he was in proceedings was because he was arrested as a result of his mental health symptoms. On this point, just to clarify, the briefing hints at maybe a multiple source theory, but are you contending today that you're still relying, you're staying with a single source theory, that what we're looking at is a single chain of events from the unavailability of medication to the erratic behavior drawing the attention of authorities to likely torture in a mental institution. Is that right? No, Your Honor. So where do you discuss in, where should we look in the record to find the development of a multiple source theory? Under the regulations, the agency is required to consider all evidence relevant to the country conditions evidence. Sure, but in which instance, I guess to cut to this particular case, so where is the risk of torture outside of a mental institution at the end of the chain of the first thread established in the record, or where was that developed in the record? I can give you a few examples. At AR 1062, an Amnesty International report discusses Jose's risk of torture by arrest and detention, and at AR 1370, another report talks about the risk of torture in jails and prisons. But these large country condition reports are put in, and then the immigration courts rely on counsel to tell them the parts that are relevant to the case before them. Where in your brief to the BIA did you present and develop an argument that due to his mental health condition, he was likely to be tortured by police, apart from police turning him over to the mental health system? At AR 73, we describe Jose's risk as by torture and police, and we argue that the immigration judge ignored evidence relevant to that risk. Well, I'm sorry. In the BIA, and the section on likelihood of torture begins on AR 37, and there is, and this is the sentence you quote in your brief, Jose asserted a risk of future torture by Mexican mental health care workers and by Mexican law enforcement, and you would quote that sentence and italicize the latter part. But the remainder of the argument is entirely about the mental health system. There is nothing that develops this Mexican law for nothing. So how is that a sufficient presentation or exhaustion of that issue to the BIA that we can fault the BIA for not treating that as if it's a separate, multisource theory? The agency did state that it was considering Jose's risk of torture in the aggregate, and this court in a federal appendix case, the Chicho V. Barr, has held that the emphasis on one potential ground of torture does not mean that the applicant has waived other grounds. Yeah, but you have to assert the ground. Where is, where is the, where was the explanation or anything that said about here's the risk from the Mexican law enforcement before he gets to the mental hospital, here's what's going to happen. Where is that argument in the BIA? The agency, the country conditions evidence, Your Honor. And I'd like to quickly before, unless Your Honor has more questions on that point, turn, we're already discussing aggregation analysis, but I'd like to turn to the agency's application of a heightened burden. Under matter of JFF, this court, the agency recast Jose's claim as predicated on a hypothetical chain of events, and then required him to show that each link in that chain of events would or will occur. That's on the plain language of the decision, and this court has held that on its face, that is error. And isn't that a colloquial way? If we say that something, it's more probable than not that something will occur, isn't that colloquially similar to saying that it will occur, if you have to show that it will occur? Your Honor, the cases for the agency to take colloquialisms, and the idea that, as the government asserts, the agency is allowed to use shorthand is novel. Rather, the precedent of this court shows that we look to the plain language of the agency's decisions to decide what burden it held the applicant to. And here, the use of would or will shows that it required Jose to prove to a near certainty that he would be tortured. And I'd like to give the floor to my colleague, Abreu Harta. Good morning, Your Honors. Abreu Harta for the Jose Roberto Garcia Aguilar. Your Honors, the main issue on the PSC determination is that the board, by crediting Carolina's testimony that she was injured, committed improper fact finding. Instead of determining whether the IJ's credibility determination on that point was clearly erroneous, the board instead posited that testimony is testimony that the IJ had found implausible when weighed against other record evidence. By doing so, the board improperly took on the IJ's role as fact finder. What we're asking here is... Isn't it, isn't what the BIA did, because BIA was addressing a claim that the IJ's handling of the credibility determination was defective. Isn't what the board did similar to what courts do on summary judgment all the time, which is say, well, assuming that that evidence is true, so you construe it in the light most favorable, take it as true, it still doesn't add up. Why is, why, because it didn't seem like the board was actually weighing and making an actual finding that it was credible. It just, we don't need to resolve this issue about whether the credibility determination is defective, because even if we were to reach that conclusion, here's what would follow, and it doesn't work. But I think that doesn't work here, Your Honor, because what the IJ did was different. The IJ said, these two sets of facts are implausible when taken together, so I'm going to discount Gadolina's testimony as not being injured and find that there are other facts that show that she was. For example, the IJ said that the nature of the crime must mean that she was traumatically injured. The BIA, by then crediting that testimony, was taking that, those facts as true, and weighing them against these other facts, and that is a fundamentally, quintessentially, fact-finding endeavor that the IJ had found a very different way. So the BIA was using a different set of facts to come to its conclusion than what the IJ used. What do you view as the facts found by the BIA that differed from the facts found by the IJ? So what the BIA did was find, if taken, Gadolina's testimony is true that she was not injured, that was a new fact that the IJ had discredited. So the IJ had said, I cannot believe that that can be true, that she was not injured, if I'm going to also believe that the nature of the crime and the elements show that she was. So the BIA was importing that fact, that she was injured, into its analysis, and then, as even the government argues, weighing that evidence against the other record evidence, and coming to its own PSC determination. That was improper. We don't know if the IJ had come out the other way on Gadolina's testimony, if she would have also said, in fact, she had said, this is material to her decision. If I find that she's credible, then I can't find these other facts, because I've decided that she was injured. So the BIA did a completely different thing than what the IJ would have done, potentially, if she had come out the other way on her credibility determination. Your Honor, unless there are any other questions, I do want to reserve the time for my colleague for a bubble. Thank you. Thank you. Now, from Mr. Sheffield. You may proceed. Good morning, Your Honors, and may it please the Court, Fred Sheffield, on behalf of the respondent. We're asking that this Court deny the petition for review because, on the first matter, the particularly serious crime, the agency properly acted within its discretion in determining that petitioner's conviction for willful infliction of corporal injury on the mother of his child, in this case, was a particularly serious crime, such that he is not eligible for asylum and withholding of removal. And second, substantial evidence supports the agency's determination that petitioner is not more likely than not to be tortured in Mexico for reasons related to his mental health. With the Court's permission, I'd like to first touch on the PSC issue, the particularly serious crime issue that opposing counsel just discussed. We would note that petitioner is not broadly challenging the Board's weighing of factors. Rather, his argument is a very narrow one. He claims that the Board engaged in improper de novo review of IJ fact-finding. We believe that petitioner's argument is really based on a misunderstanding of the Board's decision. The Board did not overrule the IJ's fact-finding. It did not make a claim that Petitioner Galvin's testimony could coexist with other evidence. What the Board says was we don't really even need to reach this issue, because regardless of whether you credit all the facts presented by petitioner, it still adds up to the same result. It still adds up to a particularly serious crime. What were the facts the BIA assumed arguendo with respect to the injury question in making its de novo review a particularly serious crime? As I read the Board's decision, really the sole fact was whether one could credit, one could regard as credible Ms. Galvin's testimony that she was not injured. So what the Board, the way I read the Board's decision is the Board's saying one can imagine two sets of fact findings. One includes, as the IJ found, Ms. Galvin was in pain. She fell to the ground. She was taken to the hospital. But under the IJ's version of finding, you don't credit as credible her specific statement that she was not injured. The Board says, okay, we can look at all those same facts. She was in pain. She fell down. She was taken to the hospital. And we can add the fact that the IJ found was not consistent with the other evidence. We can credit her claim that she was, quote, not injured in her view. And it doesn't matter. It still adds up to the same conclusion. What do you do with the fact that one of the statutory elements of conviction is that she was injured? Right. I think that only further, I mean, that's technically a different part. That was one of the IJ's main reasons for finding her, not... Right. Right. And that certainly is kind of a point in the IJ's favor for why the credibility determination might stand. But the Board, I don't think, even reached that issue. Because the Board said, even if you were to somehow credit the testimony that she was not injured, I think we cited to Dye, which is a Supreme Court case, that even credible testimony may not establish the fact that it's going to. And I think that's important here. I think the Board was operating with an assumption that, you know, Ms. Galvin may have been... Describing yourself as not being injured could mean a lot of different things to a lot of different people. And, you know, maybe in her subjective experience she was not injured. But... And that would still be consistent with the situation where she was in pain, she was taken to the emergency room. So from the Board's perspective, you can credit Ms. Galvin's testimony or you cannot credit Ms. Galvin's testimony on whether she was injured. It all points to the same direction. I think it's also... It should also be noted that it's really not exactly clear what Petitioner's ultimate aim here is in seeking remand on the particular social group... Or, sorry, the particularly serious crime issue, apart from simply prolonging proceedings. Again, the Board has already determined that even if you take all of the facts as presented by Petitioner and you assume them to be credible, in the Board's view, this still amounts to a particularly serious crime. So I think the most that Petitioner could really hope for is remand for some sort of clarification from the agency that all of the facts indeed are being regarded as credible. But then you'd be left with a situation where the Board would, under its de novo authority, weigh the evidence. And we know how the Board would come out on that because it's already done so. It's told us. All of these facts add up, even assuming they're all credible, add up to a particularly serious crime. I want... To the extent that Petitioner's brief suggests that weighing of evidence is not appropriate, we would definitely push back on that. The Perez-Palifax case that we cite on page 32 of our brief is very clear on that, that it's entirely appropriate in these particularly serious crime determinations for the Board to weigh evidence. Petitioner's reply brief notes that weighing of conflicting evidence is quintessentially a fact finding endeavor. But again, the Board's decision in this case was not that we are going to weigh conflicting evidence. The Board held that regardless of how one comes down on that issue of whether she was credible or not, under the Board's de novo review, you get to the same spot, a particularly serious crime. Unless there are any further questions on the particularly serious crime issue, I'll move on to the agency's CAT determination. And I wanna first start by mentioning Petitioner's argument that the agency did not respond to aggregate sources or law enforcement. I think the most straightforward way to look at this issue is that the immigration judge explicitly mentioned law enforcement and explicitly mentioned mental health facilities as possible sources of torture. The immigration judge explicitly mentioned that she was considering the aggregate risk. And in its decision, I think on the last page of the Board's decision, you see the Board citing to those pages of the immigration judge's decision where the immigration judge mentioned aggregate risk. We filed a 28 J letter a couple of weeks back pointing to a case called Andrade. And Andrade really rejected... Discussed and rejected almost the same argument, it seems, that Petitioner's making here with respect to aggregate sources. And in Andrade, the court said, the Board's citation to the immigration judge's reference to consideration of aggregate sources was sufficient. So we believe Andrade really resolves this issue. Even if... I mean, there's kind of a tension between two potential ways to read the BIA order. One is that, by referencing all sources, it actually considered whether or not the cops would torture him before he got to the mental hospital. But the other way is to say that it's not exhaustive because the claim is never presented to the BIA, and therefore... So one seems to posit that they actually resolved it, and the other says, well, it's not exhaustive, so they never considered it. Which one of those is the right way to read the BIA order, because they're not consistent? I think the second reading is, frankly, the better reading. The immigration judge really laid out how she understood Petitioner's case, and it was based on a single series of suppositions that needed to come true, at least be it means aggregate of all I've been presented by the Petitioner in terms of arguments. Right. And I think... We can't really construe that as referring to an argument that wasn't raised. I think that's correct. I think... Yeah, and I think this points ultimately to exhaustion, because the immigration judge made it very clear how she understood the case. Petitioner's likelihood of torture would turn on one, losing access to medication, two, behaving so erratically that he would come to the attention of law enforcement, and then either be tortured by law enforcement in the process of being picked up by law enforcement, or by virtue of being institutionalized. But either way, the only way you get to either law enforcement or to an institution is you have to, in Petitioner's case at least, lose access to medication or behave erratically. Well, is that... Does the record here give us enough to go on with respect to those two pieces? I mean, with respect to the behaving erratically, the whole reason that he was in this process was because his erratic behavior led him to the attention of the authorities, and the IJ does not seem to credit that risk. Well, I think it's important to remember the broader context in which removal proceedings were initiated. The facts are that Petitioner got into a car accident in November 2017. According to Ms. Galvin's statement, he was okay up until that time. But Petitioner's note in their brief, they claim that there's support in the record for the fact that Petitioner has a long standing mental illness that dates back to at least 2014 or 2015. I looked at those citations, I didn't see it. What I see is Petitioner appears to have lost his job in November 2017, and became depressed after that, and he got into a car accident, a very serious car accident that resulted in a significant brain injury. And from that period of November 2017, when the car accident happened, and when he returned home to Ms. Galvin, their relationship was particularly tumultuous. They get into an argument, she calls the police, and that's what ends Petitioner in custody and removal proceedings. And then he has these experiences of having hallucinations during the first two or three months, primarily, when he was in custody. Petitioner testified that this experience with seeing shapes and colors was fairly limited to that initial period. So I think that's an important backdrop to the immigration judge's finding that effectively, while it could be the case that some people in Mexico end up in institutions, the way Petitioner has presented his case, the evidence shows that his conditions do not appear to be so severe as to be one of the people that are at risk. On that point, we would also note that Petitioner's expert, Ms. Rodriguez, pointed to homelessness as really an important cofactor in resulting in institutionalization. Really, the only times that she was asked during her testimony of how it is exactly that people end up in institutions, she pointed to homelessness plus acting erratically. If you look at the Disability Rights International report that Petitioner's highlight frequently on AR 487 and 488, you see that same notion echoed, that in Mexico, there's an unfortunate trend of police picking up homeless people, in some cases, whether they're acting erratically. Well, why couldn't we expect that result here? He's living with family, he has lost his job, and set aside whether the medication is or isn't available. That requires some capacity to do it. Why would it not be reasonable to read the record to assume that he would be in that situation where he sent back to Mexico? I think there's nothing to point to specifically in the record. Again, the standard of review here is that the record needs to compel a contrary conclusion from that reached by the agency. Petitioner does have family. I believe his parents are both in Mexico, at least at the time of the removal proceedings. He has multiple siblings, he has aunts and uncles, or at least uncles. And when he asked about his capacity to live with his people, he mainly mentioned that these people wouldn't have enough money to pay for his medication. But he never... I don't think there was ever a claim that he couldn't live with his family members or that he would become homeless. I mean, I understand the argument as to the link that he'll have access to the medication and therefore won't show the symptoms that would attract the attention of law enforcement and put him into the mental health system. But it seems harder to say that he won't have contact with law enforcement if he does develop the symptoms, particularly given that part of the particularly serious crime was that he was likely to be dangerous in the future, so that there seems to be a tension there. Well, I think the dangerousness that comes with a particularly serious crime is something separate from his mental conditions. For one thing, as I mentioned before, his mental condition didn't seemingly arise until 2017. No, but if he doesn't have access to the drugs and he then develops the symptoms, and then for whatever reason he has a law enforcement contact, then if he's symptomatic at the time, the contact with law enforcement is likely to get him shipped to a mental hospital. The way I would respond to that, Your Honor, is that really the only instances when Petitioner has had contact with law enforcement is when he's in an argument with his spouse, Ms. Galvin. I'm out of time, but if you'll let me finish. You've got the one 2015 arrest, and then you have another 2015... You have a 2017 call to the police, and this, again, was about a month or so after a serious brain injury. So it's entirely reasonable to think that Petitioner was in a particular state of not being well. But you don't see a perpetual trend of Petitioner encountering police. That's just absent in the record. I have one final question, and that is, does the government agree with the immigration judges finding that the deplorable conditions in Mexican institutions were created for the specific purpose of torturing patients? Is that the view of the government of the United States towards the government of Mexico? That was an immigration judge's decision in this case, based on this record. I know that there have been other immigrations to reach the contrary conclusion. So I think that's ultimately a fact specific determination that immigration judges... But you're not challenging and have not challenged the actual finding. We're not challenging it in this case. No, we're not challenging it. It's a case by case determination based on the record. The immigration judge made that decision in this case. So that finding is the decision of the agency in this case, but certainly could be the case that other sets of evidence would produce a contrary result. Thank you, Your Honor. We'll hear a rebuttal from Ms. Bolt. Thank you, Your Honors. As opposing counsel notes, Ms. Rodriguez testified that Jose's route to torture in either institutions or by police was not linear. She testified... Was not what? Linear. She testified that Jose may be institutionalized by police for being homeless, acting radically in public, or committing a crime, even a petty crime, or by family members. The 2018 arrest that the government refers to actually occurred after Carolina called the police because Jose was refusing to seek treatment. The medical records that the agency ignored also showed that Jose's symptoms while he was briefly off of his medication during proceedings returned a mere month later, and after he was before the immigration judge, he went back to emergency services to receive more psychotic... Antipsychotic medication. The Supreme Court has also found that when deciding... When evaluating the lawfulness of agency's actions, including rejecting the testimony of an expert, it should not look to the ex post rationale. To decide that issue. So here, the government's arguments that Ms. Rodriguez's testimony was not highly probative or potentially dispositive are premature when the agency itself did not offer those rationales. All right. Thank you, counsel. The case just argued will be submitted.
judges: COLLINS, THOMAS, JOHNSTONE